## Ouita MARTIN v. SIMMONS FIRST NATIONAL BANK, Trustee et al

5-5448                                          467 S. W. 2d 165

Opinion delivered May 24, 1971

*Brockman, Brockman & Gunti,* for appellant.

*Coleman, Gantt, Ramsay & Cox,* for appellees.

JOHN A. FOGLEMAN, Justice. The chancery court held that the separate assets and income of Ouita Martin should be taken into consideration before the trustee of a trust for her benefit, created by the will of her sister, Elizabeth Nichol, could invade the corpus of the trust for Miss Martin's hospital, medical, drug and nursing expenses. Appellant contends that, under the circumstances existing here, she is not required to exhaust all her resources, or even her income, before these expenses are paid for by the trustee.

Determination of the principal questions involved on this appeal depends upon construction of a clause in

the will of Elizabeth Nichol, who died in 1963. That clause reads:

> In the event the said income is not sufficient to provide for the needs of my said sister by reason of her illness or by reason of accident or other calamity [a]ffecting her, the trustee shall sell such part of any of the shares of stock held by it as trustee and as shall be reasonably necessary to provide for the needs of my said sister and use the proceeds for that purpose.

The corpus held by the trustee at the time of the institution of this action were 3,711 shares of the stock of Simmons First National Corporation, a one-bank holding company, and 110 shares of Arkansas Oak Flooring Company. At the time of Mrs. Nichol's death the flooring company stock and 2,475 shares of Simmons First National Bank were designated by her as the trust corpus. The trustee converted the bank stock into holding company stock at the time of the organization of the company, whose principal corporate purpose was ownership of the stock of the bank. The increase in number of shares was attributable to stock dividends.

The bank has been paying the income from the trust to Miss Martin at the rate of $490 per month, with appropriate adjustment annually, so that she has received all income from the trust. The total annual disbursements ranged from $5,767.20 to $7,792.19 during the years from 1964 to 1969.

The present action was precipitated by reason of an injury and an illness suffered by Miss Martin, requiring unusual medical expenses, but she also contended that current inflation has caused an increase in her cost of living and constituted "a calamity affecting her" under the terms of the pertinent clause. She filed her petition in September 1969 asking judgment against the trustee for medical expenses incurred by her and directions to the trustee to pay all medical, hospital, surgical, and nursing expenses accrued to the date of hearing, and to pay all future medical, hospital, surgical and nursing

expenses. She prayed that the trustee be directed to sell shares of stock held by it for these purposes. Her petition was opposed by the trustee, as it had ascertained before the filing of appellant's petition that there would be objection on the part of some of the residuary beneficiaries of the trust. The petition was also opposed by these residuary beneficiaries. Both the trustee and these beneficiaries are appellees here.

The chancellor made an. exhaustive review of authorities and concluded that it was the intention of the testator that the corpus of the trust be invaded only in case the "needs" of appellant required when her private means were taken into consideration, and that there should be no invasion of the corpus until appellant's expenses because of illness, accident or calamity were in excess of all her means consisting of her own private resources as well as the net income of the trust. The decree incorporated the chancellor's findings, and defined the resources and assets of appellant which must be exhausted before invasion of the corpus as the principal, dividends, interest and any other income from investments in land, stocks, bonds, savings and checking accounts in banks and savings and loan institutions, including any accounts standing in the joint names of appellant and others and other investments of a similar nature and type.

On trial de novo, we reach a different result in some respects. Our different conclusions do not result so much from a disagreement with the chancellor on the law involved as from its application to the facts in this case. Of course the paramount and overriding rule of construction is to ascertain the intent of the maker, preferably from the four corners of the instrument itself. *Clay* v. *Benton*, 248 Ark. 691, 453 S. W. 2d 405. The courts should give a will that construction which accomplishes the purposes and objectives of the testator. In order to determine the intentions of the testator consideration must be given to every part of her will. *Carroll* v. *Robinson*, 248 Ark. 904, 454 S. W. 2d 329.

Mrs. Nichol's will, made April 16, 1962, makes the following provisions:

First: Usual provisions for payment of debts and funeral expenses.

Second: Devise of life estate in home of testatrix to appellant, with remainder to First Presbyterian Church of Pine Bluff.

Third: Outright bequest to appellant of all furniture, furnishings, silverware, chinaware, and other articles of household and domestic use in the home, together with all clothing, jewelry and other personal effects not otherwise disposed of by the will, any automobile owned by testatrix and $20,000 in cash.

Fourth: Establishment of trust here involved, requiring distribution of income from stocks to appellant. Direction for termination of trust upon death of appellant by sale of stock then in possession of trustee and payment of net proceeds to six named nieces and nephews.

Fifth: Bequest to a nephew of husband.

Sixth and Seventh: Bequests to charitable institutions.

Eighth: Bequest of watch and bracelet to a niece who is one of the residuary beneficiaries of the trust.

Ninth: Bequest of diamond bar pin to a niece who was not a residuary beneficiary of the trust.

Tenth: Bequest of diamond engagement ring to another niece who was residuary beneficiary of the trust.

Eleventh: Bequest of diamond solitaire ring.

Twelfth: Bequest of diamond dinner ring to niece who was still another residuary beneficiary.

Thirteenth: Bequests of cash to relatives in varying amounts, including the six residuary beneficiaries, who were to receive amounts varying from $1,000 to $6,000.

Fourteenth: Bequests to cousins.

Fifteenth: Bequest to First Presbyterian Church, Pine Bluff.

Sixteenth: Division of residue with one-half to go to appellant and other one-half in equal shares to six nieces and nephews who were named as residuary beneficiaries of the trust.

Seventeenth: Direction that estate taxes be paid out of residuary estate.

Eighteenth: Nomination of executor.

Examination of the will can only lead to the conclusion that appellant was intended to be the primary object of Mrs. Nichol's bounty. Others were given consideration secondarily or incidentally. Except for specific bequests, the residuary beneficiaries were to share in the estate only after all debts, taxes and expenses of administration had been paid, all other specific bequests had been distributed and the trust established. They are then to benefit from the trust only to the extent that it has not been exhausted in providing for appellant in the eventualities mentioned in the clause in question. This preference standing alone, however, is not of sufficient significance to control the construction of the clause according to appellant's contention. Furthermore, we cannot say that the meaning of the words in the pertinent clause is so clear and unmistakable that we can determine the testator's intention from the language of the will alone. We agree with the chancellor that similar clauses have led to much litigation and considerable disagreement by the courts as to their meaning. We also agree with the chancellor that the sole decision of this court shedding any light upon the subject is *Cross v. Pharr*, 215 Ark. 463, 221 S. W. 2d 24, where we said:

> Unless something appears in the will indicating a different purpose, it is ordinarily presumed that the trustor intended the beneficiary to be supported and maintained from estate income, or as is sometimes the case, from sale of a part of the corpus. See 101 A. L. R., 1461 et seq.; Restatement of the Law of Trusts, § 128, Comment "e"; Scott on Trusts, p. 672.

In that case, the clause in question required the payment of net income from a trust estate to the beneficiary "when and as the same may be needed" by her. The chancellor correctly pointed out that corpus was not involved there. Authorities cited for our statement in *Cross,* ultimately lead to the fundamental proposition in any such case—that the intent of the trustor must be determined from the language of the trust interpreted in the light of the circumstances.

> Whenever there is uncertainty as to the intention of a testator which cannot be clearly ascertained when the words of his will are considered in their ordinary sense, the court must read the language employed by the testator in the light of the circumstances existing when the will was written and, in order to put itself in the place of the testator as nearly as possible, may consider all surrounding facts and circumstances known to him, including the condition, nature and extent of the testator's property, his relations with his family and other beneficiaries named, the motives which may reasonably be supposed to influence him, the subject matter of the gift, the financial condition of the beneficiary and other such matters. *Murphy* v. *Morris, Executor,* 200 Ark. 932, 141 S. W. 2d 518; *Rufty* v. *Brantly,* 204 Ark. 32, 161 S. W. 2d 11; *Thompson* v. *Arkansas Nat. Bank of Hot Springs, Trustee,* 220 Ark. 802, 249 S. W. 2d 958; *Eagle* v. *Oldham,* 116 Ark. 565, 174 S. W. 1176, 1199.

> A review of the pertinent circumstances reveals the following:

> Miss Martin had lived in her sister's home since 1921. When she came there she was employed at the

local school cafeteria, but she had not been employed for 45 years. Appellant was 80 years of age on August 26, 1969.

The dwelling house is a very old two-story building consisting of seven rooms and a sleeping porch, located upon a large lot. Appellant testified that she had cared for Mrs. Nichol who was in poor health during the last few years of her life. She also said that she looked after the housekeeping during that time.

Appellant's physician testified that he had seen Miss Martin as a patient since 1946, that she suffered grand mal epileptic seizures as early as 1961 and that she then gave a history of such seizures early in life. He had also treated Mr. and Mrs. Nichol and the mother of Mrs. Nichol. This physician had an intimate relationship with the family. He had discussed appellant's condition with her sister and brother-in-law, and testified positively that the testatrix was aware of appellant's condition on the date of execution of the will. The doctor related that he had treated both Mr. and Mrs. Nichol during illnesses in their home and that being cared for in the home was a way of life in the family.

Appellant had little in the way of financial resources when Mrs. Nichol died. They consisted largely of approximately 62 shares of Arkansas Power & Light Company stock, $4,000 on deposit in Southern Federal Savings & Loan Association and 90 shares of the stock of Container Corporation, which she inherited from her mother.

Our view of these circumstances and the terms of the will leads us to the conclusion that it was the intention of the testatrix that appellant be enabled to spend the rest of her life in the home where she had lived for 50 years and in the style of life to which she had become accustomed. There is little room for doubting that Mrs. Nichol was fully aware of her sister's physical and financial condition. There is little likeli-

hood that the income from the trust would have been expected to maintain the dwelling house and grounds and support Miss Martin in her customary style and still provide full medical, hospital and nursing care to her in case of illness, without encroachment upon the corpus. The testatrix's apparent desire that the particular stocks constituting the trust be held intact except for authorized invasion until Miss Martin's death seems to indicate that she was more concerned with security than quantity of income.

As the life tenant, Miss Martin pays property taxes on the home and contents. The real estate taxes amount to $291.58 annually. She also maintains insurance thereon at a cost of $71 per year. Her expenses for maintaining the large yard are great, approximating $100 per month, which includes necessary annual tree surgery. She averages general house maintenance at $35 per month. She had paid $750 for replacing the roof and $650 for replacing the furnace. Shortly after Mrs. Nichol died, Miss Martin paid $3,000 to put sheetrock on the interior walls. Appellant said that the plumbing and water tank were constantly in need of repair. She pays $22 per week to a cook who has been in the employment of the family for 25 years. This cook works five days per week, preparing only the noon meal each day. Miss Martin is unable to drive a car, so she pays a driver employed some 25 years, on an occasional basis. Her grocery bill averages approximately $90 per month. Utility bills run to $50 per month, and the telephone bill costs her a little less than $20 per month. Miss Martin estimates that she spends only $30 per month for clothing and $15 for laundry and cleaning. She pays $8 per month for insurance on the automobile left her by Mrs. Nichol.

While she is eligible for Medicare benefits, she pays $7.20 per month for Blue Cross-Blue Shield Medi-Pak insurance providing excess coverage over Medicare payments. She averaged her real and personal property and income tax payments at $66 per month. Miss Martin's annual income from sources other than the trust consists of the following:

| | |
|---|---|
| Social Security | $612.00 |
| Dividends from AT&T stock | 48.00 |
| Dividends from First Federal Savings & Loan Association | 285.00 |
| Dividends from Guaranty Federal Savings & Loan Association. | 294.39 |

At the time of the trial she had $5,770.74 on deposit with First Federal Savings & Loan Association and $6,196.13 with Guaranty Federal Savings & Loan. She valued her corporate stock at $1,000. All these assets came from the specific cash bequests to appellant, with the possible exception of the AT&T stock which may have been purchased from the proceeds of AP&L stock she surrendered to the company. It appears that she received nothing as a residuary legatee and devisee.

Appellant gave the stock in Container Corporation inherited from her mother to relatives other than those who are appellees. She testified that she gave 52 shares of AP&L stock she owned to appellee Frances M. Bailey. She had also given the money she had in the bank to relatives and to charity. All these gifts were made before she suffered the shoulder injury.

Subsequent to Mrs. Nichol's death, Miss Martin has suffered two illnesses which required hospital confinement. She spent seven weeks in a hospital when she suffered a broken shoulder in August 1968, and two weeks in 1969 as the result of a stroke. She now walks around the house only with the aid of a cane and by holding onto some other support. She can hardly walk outside the house. She testified that it was necessary that she have nursing care at night since July 11, 1969. The nurse she employed is paid $50 per week for spending the night with her, applying hot packs, dressing and bathing her, measuring her medicines, helping her downstairs and taking her places she must go. The nurse comes on duty about 9:00 p.m. Appellant states that her drug bill runs $25 per month.

A friend by the name of Lucille Mason has lived with appellant since 1963. She pays no rent but contributes

to the payment of the telephone bill. Miss Mason is employed, but attends to getting breakfast and supper and Saturday meals for both herself and Miss Martin. Appellant testified that her friend brings her own food for meals that she does not eat at the school where she is employed and that its value exceeds the cost of any of appellant's groceries consumed by the guest.

Appellant's charitable contributions amount to approximately $60 per month. Her estimate of her cost of living, without considering the contributions, and without allowing any amount for medical and hospital bills is $773.85 per month.

Dr. Talbot has treated appellant for arteriosclerosis, recurrent migraine headaches, osteoarthritis, and osteoporosis of the spine in addition to her epilepsy, her stroke and her injury. He suspected that her shoulder injury resulted from a seizure. He was of the opinion that appellant's condition requires the presence of a nurse or someone else because of the constant hazard of accident, which is intensified by the possibility of seizures which cause her to lose consciousness. He characterized these as "breakthrough" seizures because they occurred in spite of preventive medication. The doctor felt that, considering the presence of the cook and appellant's friend, the nursing service she had was adequate and reasonable, and predicted that more care would probably be needed in the future. In his opinion, Miss Martin will respond better both physically and mentally to treatment in her familiar surroundings, and her removal from the home to a nursing home or hospital would be demoralizing in the utmost. He felt that the estimate of $25 per month was a reasonable amount for necessary drugs and medicines.

There was evidence showing that the bank stock was "low-income" stock and that an investment of its present value in other securities would produce a substantially larger income. Yet it seems clear that the testatrix intended that the corpus of the trust consist of the shares of stocks designated by her throughout its existence, because the trust clause limits the trustee's

power to sell to the eventualities named in the particular clause we are considering, until the death of Miss Martin, when all the remaining stock is to be sold. Directions as to reinvestment are also lacking. The duties of the trustee with reference to the stock are directed toward its preservation. We can only assume that Mrs. Nichol had knowledge of the characteristics of the stock placed in trust. Her husband was formerly president of the Simmons bank. It is not unreasonable to infer that one reason for inserting the provision for invasion of corpus was because of these relatively low dividends.

It is certain that the gift of the trust income is absolute and unrestricted as to use. The fact that the testatrix used the words "in the event the said income is not sufficient to provide for the needs of my sister by reason of illness, or by reason of accident or other calamity affecting her" is significant to us. If she had intended that appellant first exhaust her own resources before there was any encroachment it would have been quite easy for her to have used the words "in the event my sister's income is not sufficient" or "in the event my sister's resources are not sufficient." But she did not even say "in the event that the income from the trust and my other bequests to my sister are not sufficient." We conclude that it was the intention of the testatrix that the expenses of her sister because of illness or accident be provided from the trust, without regard to any resources that Miss Martin might have, and that she did not have in mind the very narrow and restricted definition of "need" as indicative of destitution. The word "need" is also defined as "The lack of anything requisite, desired or useful; . . . anything needed or felt to be needed, as our daily needs." Webster's New International Dictionary, Second Edition; see also Third Edition.

We do not mean to suggest that unbridled discretion is vested in Miss Martin as to expenditures for her living costs or that she may incur any expense she chooses for medical and nursing care. We do not think that it has been shown that her present expenditures are excessive in view of the standard of living she has enjoyed

for 50 years and in view of care rendered necessary because of illness. Nor do we feel that the corpus of the trust was intended to support Miss Martin's charities, beyond those which might have been anticipated by the testatrix at the time of the execution of the will. We do feel that the testatrix intended that the corpus be invaded to pay any additional expense to Miss Martin arising by reason of illness, accident or other calamity, if the income from the trust proved inadequate for that purpose after her payment of usual and customary living expenses from the income from the trust. In this respect it is to be noted that the trustee is directed to sell such part of the shares of stock as shall be "reasonably necessary to provide for the needs" of appellant and to use the proceeds for that purpose. Consequently, the trustee is charged with the exercise of discretion as to what is "reasonably necessary."

Miss Martin first requested payment by the trustee of expenses attributable to her illness on or about July 11, 1969. At that time it appears that the following items had accrued:

| | |
|---|---:|
| Jefferson Hospital (This amount was charged to Miss Martin over and above Medicare and Blue Cross Medi-Pak) ' | $ 102.00 |
| Mrs. Clara Phillips—special nursing at hospital | 28.00 |
| Mrs. Clara Phillips—14 weeks nursing at home, $50 per week | 700.00 |
| Consumers Drug Co.—3/15/69 to 6/27/69 | 89.55 |
| The Doctors Clinic—4/10/69 $15.00 and 5/8/69 $151.00 | 166.00 |
| Total | $1,085.55 |

Of these items, Miss Martin had paid and was seeking reimbursement for the hospital bill, the clinic item and the drug bill. While she had paid the nurse, it is not clear from the record whether the payment was made

before or after her request that these items be paid by the trustee. Miss Martin testified that she continued to pay the nurse after her request was refused and that she incurred additional drug expenses of $258.79 after July 11, 1969.

The fact that the trustee is not required to look to other means of Miss Martin before encroaching upon the corpus for her needs arising out of illness or accident does not mean that the trustee is required to invade the corpus to reimburse appellant for moneys voluntarily spent by her prior to any demand for payment from the trust principal. If the trustee were required to reimburse appellant for such expenditures, which may or may not have been made from income from the trust, she would be enabled to exercise her discretion as to the number of shares of stock to be sold. This would deprive the trustee of discretion vested in it, and permit the life beneficiary to dissipate the trust to the detriment of the residuary beneficiaries. The fact that she paid these expenses without any demand on the trustee is at least some evidence that the income paid to her was then sufficient for those purposes.

We hold that appellant is not entitled to reimbursement for any expenses paid by her before her demand upon the trustee for the payment thereof in July 1969. See *In re Hoepner's Estate*, 176 Misc. 47, 27 N. Y. S. 2d 398 (1941); *Clark* v. *Mississippi Valley Trust Co.*, 360 Mo. 452, 228 S. W. 2d 808 (1950); *Green* v. *Cleveland Bank & Trust Co.*, 6 Tenn. App. 685 (1928). The trustee should, however, investigate all expenses of Miss Martin attributable to her illness or accident which are now unpaid and all incurred after demand made upon it by Miss Martin to determine the number of shares of stock reasonably necessary to be sold to properly provide for all such expenses reasonably incurred taking into consideration any income of the trust remaining after the payment of Miss Martin's usual and customary cost of living, but without considering Miss Martin's income from other sources or her other assets.

Appellant also contends that the chancery court erred in denying her prayer that the trustee be required

to sell the stocks held in the trust and to invest the proceeds so as to provide an increase in the income to the trust. We do not agree. Her argument here is based almost entirely upon the fact that the trustee, without court authority, exchanged the bank stock for stock in the holding company. While we express no opinion upon the authority of the trustee to make such exchange, that question is not before us. No one has sought to require the trustee to account for its action in converting the bank stock to holding company stock. Appellant brought out the fact that the conversion of the stock pertained to a reorganization relating to the ownership of the bank.

We agree with the chancellor that the evidence does not justify a sale for reinvestment. It was the apparent intention of the testatrix that the corpus of the trust be preserved in the form of the stocks which constituted it when the trust came into existence. There is no express authority to sell except to provide for the needs of appellant for the purposes stated, and to permit distribution to the residuary beneficiaries upon the death of appellant. While there are circumstances under which a trustee may sell stock held in trust in the absence of specific authority in the trust instrument, they were not shown to exist here. The fact that the proceeds of sale of the stock could be invested to produce a greater income is not itself sufficient. It may well be that the testatrix expected the residuary beneficiaries to profit by the obvious growth potential of these stocks, even if she disregarded any sentimental reasons she might have for their being held during the lifetime of the sister who lived with her and her husband for many years. A trust officer of the bank estimated the present value of the holding company stock at $371,000. The trust officer did not know the value of the flooring company stock. The former was valued at $139,218 at the time of the creation of the trust and the latter at $42,350. A sale, he pointed out, would require payment of income taxes on the gain. He felt that putting all the Simmons stock on the market at once would depress the per share price. The interests of the residuary beneficiaries are not to be ignored. Furthermore, there has been no evidence to

show that there has been any decline in the value of the new stock or that it produces less income than the bank stock.

Appellant argued in the lower court that continuing inflation causing a rise in the cost of living is a calamity which also justifies encroachment upon the corpus. The chancellor found it unnecessary to decide this question. Appellant seems to have abandoned that argument here. At any rate, we do not find the evidence sufficient to support such a finding at this time.

The cause is remanded with directions to the chancery court to enter its decree instructing the trustee to proceed in accordance with this opinion.